# EXHIBIT A

STATE OF MINNESOTA                              DISTRICT COURT
COUNTY OF SIBLEY                         FIRST JUDICIAL DISTRICT

---

*In re Syngenta Litigation*

**HEARTLAND CORN PRODUCTS,**
individually,                                   Court File Number:
                                                Case Type: Other Civil
      Plaintiff,
                                                **COMPLAINT**
vs.                                             **JURY DEMAND**

**SYNGENTA SEEDS, LLC,**
**SYNGENTA CORPORATION,**
**SYNGENTA CROP PROTECTION, LLC,** and
**SYNGENTA BIOTECHNOLOGY, INC.,**
individually and jointly,

      Defendants.

---

      COMES NOW Plaintiff, HEARTLAND CORN PRODUCTS ("Heartland"), by and

through its attorneys, and brings this civil action against Defendants Syngenta Seeds, LLC,

Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Biotechnology, Inc.,[1] and

states and alleges as follows:

### INTRODUCTION

      1.    Heartland brings this action against Syngenta for harm caused by Syngenta's

decision to negligently, recklessly, and prematurely market, distribute, and sell genetically

modified corn seed that was not approved in major U.S. export markets. As a result of Syngenta's

refusal to wait for its new biotech traits implanted in genetically modified corn seed to be approved

for human and/or animal consumption by major U.S. export partners, and the subsequent and

---

[1] Defendants Syngenta Seeds, LLC, Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta
Biotechnology, Inc. are hereinafter referred to collectively as "Syngenta" or "Defendants."

foreseeable discovery of this unapproved trait in exports to China, Syngenta has caused damages

to U.S. corn industry stakeholders, including ethanol plants and biorefineries, such as Heartland.

Syngenta's conduct in marketing, distributing, and selling corn seed that was unapproved for

import in major foreign markets violated the legal standards of the marketplace because the

primary market risk falls on U.S. farmers and other members of the industry, including Heartland,

not on Syngenta.

2.     Syngenta marketed, distributed, and sold its genetically modified corn seed with

unapproved biotech traits in total disregard of the rights of industry stakeholders and the impact

its actions would have on the U.S. corn and distillers grains market. As foreseen, Syngenta's

genetically modified corn contaminated the U.S. corn and distillers grain supply. China, the fastest

growing export market for U.S. corn and distillers dried grains with solubles ("DDGS"),

discovered the contamination and banned the import of contaminated U.S. corn and, later, DDGS.

As a result of the DDGS ban, the price of U.S. distillers grains fell dramatically.

3.     Beginning with the 2011 growing season, Syngenta began marketing, distributing,

and selling a new type of hybrid corn seed sold under the trade name Agrisure® Viptera™

("Viptera").  Viptera contains a new genetically modified trait known as "MIR 162." Syngenta

claims that its Viptera corn seeds increase yields (as compared to other types of corn seed) due to

improved resistance to insects. Despite knowing the rest of the world was not as eager as the United

States to adopt bio-engineered food or feed, Syngenta began selling Viptera in the United States

before other countries decided whether to approve it.

4.     At all times relevant hereto, Syngenta was well aware of the "highly regulated"

nature of new genetically modified traits in foreign markets and understood that "[a]pprovals of

genetically modified (GM) seed products occur at different times due to differences in country

2

regulatory processes."[2] As Syngenta knew or should have known would happen, the European Union, China, and most other countries needed time to determine whether to approve Viptera for human and/or animal consumption. Between 2011 and 2013, certain countries approved Viptera for food and feed use; however, other countries, including China, did not. China has adopted a "zero tolerance" policy with respect to unapproved genetic traits.

5.      In November of 2013, Chinese government officials discovered the Viptera trait in shipments of what was supposed to be non-Viptera corn from the United States. After testing conducted over the next several weeks and months revealed that numerous shipments of U.S. corn from U.S. exporters were contaminated with MIR 162, China banned the import of contaminated U.S. corn. To date, China has canceled or rejected orders for hundreds of millions of bushels of U.S. corn.

6.      In late December 2013 or early January 2014, Syngenta's unapproved genetically modified trait was also detected in U.S. shipments of DDGS to China. At all relevant times, Syngenta was aware that China's zero-tolerance policy for unapproved genetically modified traits applies to all commodity imports, including DDGS. In June of 2014, Chinese officials at the General Administration of Quality Supervision, Inspection and Quarantine ("AQSIQ") unofficially stopped issuing new permits for imports of U.S. DDGS because of widespread contamination of U.S. DDGS shipments with Syngenta's MIR162 trait. Then, in July of 2014, AQSIQ announced that all imports of U.S. DDGS must be officially certified as free of the MIR162 genetically modified trait before they leave U.S. ports. The U.S. government does not issue zero tolerance certification for genetically modified commodities, nor does it conduct testing for

---

[2] *Responsible Agriculture*, SYNGENTA, http://www.syngenta.com/global/corporate/en/investor-relations/questions-about-syngenta/Pages/responsible-agriculture.aspx (last visited Apr. 13, 2016).

genetically modified traits.[3] Due to Syngenta's tortious conduct, U.S. exports of DDGS to China were effectively halted.[4] The price of U.S. distillers grains plummeted.

7.     In 2014, despite knowing from its experience with Viptera that China and other countries not only had not approved its genetically modified corn but were not likely to do so in the near future, Syngenta began marketing yet another genetically modified corn seed under the tradename Agrisure® Duracade™ ("Duracade"). Duracade contains a new GM trait known as "Event 5307." China, all 28 states of the European Union, Brazil, Switzerland (Syngenta's home country), Colombia, Egypt, India, the Philippines, the Russian Federation, Indonesia, Thailand, Singapore, Kazakhstan, Belarus, and Turkey refused to approve Duracade for human or animal consumption.[5] By improperly and prematurely commercializing its Duracade corn seed, Syngenta knowingly and intentionally exacerbated and prolonged the disruption to, and loss of, the Chinese market to U.S. corn and DDGS.

8.     The loss of a large purchaser of U.S. DDGS like China as a result of Syngenta's Viptera and Duracade contamination has had a calamitous impact on the U.S. distillers grains market.

9.     As a manufacturer and marketer of distillers grains, Heartland has been severely

---

[3] The Federal Grain Inspection Service ("FGIS"), a program of the Grain Inspection, Packers and Stockyards Administration ("GIPSA") which operates under the United States Department of Agriculture ("USDA"), issues official grain inspection certificates to reflect the quality and condition of grain exports. FGIS utilizes official standards to assign a numerical grade designation to grains. DDGS are not "grains" and are not subjected to mandatory official federal government inspection as a condition of export. *See* 7 CFR § 810.101. Moreover, GIPSA does not regulate or offer genetically modified trait event tests or testing services for grains, DDGS or any other commodity. GIPSA's role is limited to the validation of Polymerase Chain Reaction (PCR) trait testing methods and evaluating the performance of rapid test kits that detect the presence of genetically modified traits. *See* FGIS: PROGRAMS AND SERVICES – BIOTECHNOLOGY (May 24, 2017), https://www.gipsa.usda.gov/fgis/biotechnology.aspx.

[4] Stebbins, Christine, *China issues new rules on U.S. DDG imports-U.S. trade bodies*, Reuters, Jul. 24, 2014, https://www.reuters.com/article/us-usa-grains-china-idUSKBN0FT2LM20140724.

[5] INT'L SERV. FOR THE ACQUISITION OF AGRI-BIOTECH APPLICATIONS, GM APPROVAL DATABASE: 5307 (Aug. 10, 2016), http://www.isaaa.org/gmapprovaldatabase/event/default.asp?EventID=157.

harmed by Syngenta's decision to negligently, recklessly, and prematurely market, distribute, and sell genetically modified corn seed that was not approved in major U.S. export markets.

10.     This lawsuit seeks to recover the damages that Syngenta's conduct directly and proximately caused Heartland. But for Syngenta's tortious conduct, Heartland would not have suffered the injuries and damages set forth herein.

## PARTIES

11.     HEARTLAND CORN PRODUCTS is a Minnesota cooperative with a principal place of business in Winthrop, Minnesota. Heartland owns and operates a biorefinery in Madrid, Minnesota, which produces ethanol, a biofuel made from corn, and distillers grains, a co-product of ethanol production. Heartland's ethanol plant is located at 53331 MN-19, Winthrop, Minnesota 55396. Heartland's members are citizens of Minnesota and numerous other states throughout the U.S.

12.     SYNGENTA SEEDS, LLC is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Minnetonka, Minnesota. It is the information and belief of Heartland that Syngenta Corporation is the sole member of Syngenta Seeds, LLC. The predecessor entity of Syngenta Seeds, LLC is Syngenta Seeds, Inc. In or about December of 2015, Syngenta Seeds, Inc. (a corporation) converted to a limited liability company, changing its name from Syngenta Seeds, Inc. to Syngenta Seeds, LLC. A Certificate of Conversion converting Syngenta Seeds, Inc. to Syngenta Seeds, LLC was filed with the Delaware Secretary of State on December 7, 2015. Upon conversion, Syngenta Seeds, LLC assumed all debts, liabilities and duties of Syngenta Seeds, Inc. and those debts, liabilities and duties may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred by it. 8 Del. C. § 266(h). Syngenta Seeds, LLC develops and produces agricultural seeds, including, but not limited to, corn and soybean seeds, and in particular Viptera and Duracade. Syngenta

5

Seeds, LLC conducts business throughout the United States, including in Minnesota. Syngenta Seeds, LLC (or its predecessor in interest) sold and continues to sell its agricultural seeds, including its genetically modified Viptera and Duracade seeds, to growers either directly or through a network of seed dealers and distributors. Syngenta Seeds, LLC is registered to do business in Minnesota with the Minnesota Secretary of State (File Number 876007100040) and regularly and consistently conducts business in Minnesota — its principal place of business. Syngenta Seeds, LLC can be served with process in Minnesota by serving its registered agent, CT Corporation System Inc. at 1010 Dale St. N, St. Paul, Minnesota 55117-5603.

13.     SYNGENTA CORPORATION is a Delaware corporation with its principal place of business in Minnesota, which is the nerve center for Syngenta's domestic operations.  Syngenta Corporation, both directly and through its subsidiaries and affiliates, provides crop protection products and seeds for agricultural producers throughout the United States, including in Minnesota.  In addition, Syngenta Corporation provides biotech traits research services for corn and other crops. At all times relevant hereto, Syngenta Corporation operated as a subsidiary of Syngenta AG.  Syngenta Corporation can be served with process by serving its registered agent for service of process: The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

14.     SYNGENTA CROP PROTECTION, LLC is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business at 410 Swing Road, Greensboro, North Carolina 27409-2012.  Upon information and belief, the sole member of Syngenta Crop Protection, LLC is Syngenta Seeds, LLC. At all times relevant hereto, Syngenta Crop Protection, LLC operated as a subsidiary of Syngenta AG. Syngenta Crop Protection, LLC is an agribusiness involved in the research, development, manufacture and sale of crop protection products including herbicides, fungicides, insecticides and seed treatments for

6

many crops, including corn.  Syngenta Crop Protection, LLC conducts business throughout the United States, including in Minnesota. Syngenta Crop Protection, LLC is registered to do business in Minnesota with the Minnesota Secretary of State (File Number 4192627-2) and regularly and consistently conducts business in Minnesota.  Syngenta Crop Protection, LLC can be served with process in Minnesota by serving its registered agent, CT Corporation System Inc. at 1010 Dale St. N, St. Paul, Minnesota 55117.

15.    SYNGENTA BIOTECHNOLOGY, INC.[6] is a Delaware corporation with its principal place of business in North Carolina. Information obtained from the North Carolina Secretary of State indicates that Syngenta Biotechnology, Inc. was formerly known as Syngenta Agribusiness Biotechnology Research, Inc. and Novartis Agribusiness Biotechnology Research, Inc. At all times relevant hereto, Syngenta Biotechnology, Inc. employed some 25,000 individuals in over 90 countries. Syngenta Biotechnology, Inc. conducts business throughout the United States, including in Minnesota. In 2008, Syngenta Biotechnology, Inc. invested some $969 million in research and development.  In addition to its Research Triangle Park campus in North Carolina, Syngenta Biotechnology, Inc. operates a sister-site in Beijing, China, which opened in 2008. Syngenta Biotechnology, Inc. designed and developed the Viptera and Duracade corn seeds, at issue here. Since 1999, Syngenta Biotechnology, Inc. has conducted field trial/testing of corn transformation event MIR162 under USDA release permits or notifications in Illinois, Hawaii, Arkansas, Florida, Idaho, Minnesota, Puerto Rico, Mississippi, Arizona, California, Iowa, Kansas, Missouri, North Carolina, Nebraska, Texas, Wisconsin, Kentucky, Louisiana, Maryland, New

---

[6] It is the information and belief of Heartland that Syngenta Biotechnology, Inc. has now merged with Syngenta Crop Protection, LLC, with Syngenta Crop Protection, LLC, as the survivor. Nevertheless, Syngenta Biotechnology, Inc. (which was incorporated in Delaware) remains listed as an independent business entity on the Delaware Secretary of State's website.  Therefore, Heartland includes Syngenta Biotechnology, Inc. in this Complaint as an additional Defendant.

York, Ohio, Pennsylvania, Virginia, Colorado, South Dakota, Georgia, Florida, and Tennessee. Syngenta Biotechnology, Inc. petitioned the Animal Plant Health Inspection Service of the USDA to deregulate MIR 162 (Viptera) in August of 2007.[7] Since 2005, Syngenta Biotechnology, Inc. has conducted field trial/testing of corn transformation Event 5307 under USDA release permits or notifications in Illinois, Hawaii, Arkansas, Florida, Minnesota, Puerto Rico, California, Iowa, Kansas, Missouri, North Carolina, Nebraska, Wisconsin, Kentucky, Louisiana, Ohio, Colorado, South Dakota, Florida, Oklahoma, Washington, and South Carolina. Syngenta Biotechnology, Inc. petitioned the Animal Plant Health Inspection Service of the USDA to deregulate Event 5307 (Duracade) in April of 2011.[8] The company's website states that Syngenta Biotechnology, Inc. understands the "risks of [its] products" and "is committed to implementing high standards of stewardship for the safe, effective and environmentally responsible production and use of its products."[9] Syngenta Biotechnology, Inc. regularly and consistently conducts business in Minnesota. Syngenta Biotechnology, Inc. can be served with process by serving its registered agent for service of process: The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, Delaware 19801.

16.    At all relevant times, Syngenta Seeds, LLC, Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Biotechnology, Inc. have been unified in ownership and interest and have acted jointly and in concert regarding the activities at issue in this case. These entities are alter-egos of each other and they have collectively been run as a single business enterprise

---

[7] Ward, Dennis P. and Scott A. Huber, *Petition for Determination of Nonregulated Status for Insect-Resistant MIR162 Maize*, SYNGENTA BIOTECHNOLOGY, INC., OECD SYN-IR162-4, (Aug. 31, 2007), https://www.aphis.usda.gov/brs/aphisdocs/07_25301p.pdf.

[8] *Id.*

[9]    *Syngenta Agricultural Biotechnology Products*, SYNGENTA BIOTECHNOLOGY, INC., http://www3.syngenta.com/country/cn/cn/products_solution/biotech/sbcen/syn_biotechnology/Pages/Key_products.asp (last visited Feb. 9, 2016).

without regard for corporate formalities. All have been directly involved in the commercialization of Viptera and Duracade and the decision-making processes, planning, and marketing related thereto. Thus, these entities are jointly and severally liable for their tortious conduct set forth herein. Throughout this Complaint, Defendants Syngenta Seeds, LLC, Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Biotechnology, Inc. are referred to collectively as "Syngenta."

## JURISDICTION & VENUE

17.     This Court has subject matter jurisdiction over this action.

18.     This Court has both general and specific personal jurisdiction over Defendants. General jurisdiction exists as the principal place of business for Syngenta Seeds, LLC and Syngenta Corporation is in Minnesota. Moreover, all Defendants carry on a continuous and systematic part of their general business within the State of Minnesota. Defendants' contacts with Minnesota are so extensive and pervasive that Defendants are essentially at home in this State. Specific personal jurisdiction likewise exists in Minnesota because Defendants transact business in Minnesota, own, use and/or possess real and personal property situated in Minnesota, have supplied or contracted to supply services rendered in Minnesota, and have caused injuries and property damage in Minnesota, including specifically to Heartland. *See* MINN. STAT. § 543.19. Specific jurisdiction also exists because Defendants' activities in Minnesota gave rise to Heartland's claims. In particular, Syngenta has marketed, sold, and continued to market and sell its Viptera and Duracade corn in Minnesota and to Minnesota farmers. Syngenta has conducted field trials and other testing related to the commercialization of Viptera and Duracade corn seed in the State of Minnesota. As a result of Defendants' negligent conduct in and concerning Minnesota set forth in this Complaint, Heartland has suffered extensive, ongoing damages. Because a specific factual nexus exists between Minnesota and Defendants' tortious conduct giving rise to

9

Heartland's injuries and property damage, this Court has specific jurisdiction over Defendants.

19.     Venue is proper in Sibley County because Sibley County is the county in which this action was begun. Minn. Stat. § 542.01. Alternatively, venue is proper in Sibley County because Heartland's ethanol production facilities are located in Sibley County. Minn. Stat. § 542.02. Finally and alternatively, venue is proper in Sibley County because this is the county in which Heartland's cause of action or some part thereof arose. Minn. Stat. § 542.09.

20.     Heartland's claims arise solely under state law. Heartland is not making any federal claims. Neither is Heartland asserting a claim or right arising under the Constitution, treaties, or laws of the United States. Accordingly, there is no federal subject matter jurisdiction and removal is improper on that basis. 28 U.S.C. §§ 1331, 1441(b). Removal is likewise improper based on diversity of citizenship. Heartland's claims are not removable to federal court of the basis of federal question jurisdiction, diversity jurisdiction, or any other jurisdictional basis.

## FACTUAL ALLEGATIONS

### The Market for United States Corn & DDGS

21.     The U.S. is the world's largest producer and exporter of corn and DDGS. There are more acres of farmland growing corn each year than any other crop in the U.S. Over 14 billion bushels of corn–over 35 percent of the world's corn production–are grown annually in the U.S. on roughly 95 million acres of farmland. Roughly 20 percent of the over 14 billion bushels of corn grown each year is sold for export to foreign countries.

22.     During the 2011 – 2012 growing season, the export of U.S. corn generated close to $18 billion in revenues—making corn the largest and most important cash crop grown in the U.S.

23.     Minnesota is the fourth largest corn producing state in the U.S.[10]  Corn is Minnesota's largest crop.  In 2010, Minnesota produced more than 1.29 million bushels of corn on roughly 7.3 million acres of farmland.[11]  In 2018, Minnesota farmers harvested more than 1.36 billion bushels of corn from some 7.5 million acres of farmland.[12]

24.     At all times relevant hereto, a large percentage of U.S. corn has been used to produce ethanol.

25.     Notably, some 40 percent all of U.S. (and Minnesota) corn is used to produce ethanol, a fact well-known to Syngenta at all times relevant hereto.  According to the USDA Economic Research Service-U.S. Bioenergy Statistics, in the 2011 – 2012 crop year, 40.1 percent of total U.S. corn production was used to make ethanol; in the 2012 – 2013 crop year, 41.9 percent of total U.S. corn production was used for ethanol. Therefore, at all times relevant hereto, Syngenta knew or should have known that its contamination of the U.S. commercial corn supply with its Viptera and Duracade corn varieties would also result in the contamination of ethanol co-products, including distillers grains.

26.     The State of Minnesota has the capacity to produce approximately 1.27 billion gallons of ethanol per year, which currently ranks fourth among all U.S. states.[13]  "The Minnesota ethanol industry adds value to the state's largest agricultural crop – corn – by processing it into

---

[10] *2012 Minnesota Agricultural Statistics,* MINNESOTA DEPARTMENT OF AGRICULTURE, https://www.leg.state.mn.us/docs/2012/other/121196.pdf (last visited Nov. 14, 2019).

[11] *Id.*

[12] *2018 State Agriculture Overview - Minnesota,* NATIONAL AGRICULTURAL STATISTICS SERVICE (USDA), https://www.nass.usda.gov/Quick_Stats/Ag_Overview/stateOverview.php?state=MINNESOTA (last visited Nov. 14, 2019).

[13] *Production in Minnesota,* MINNESOTA BIO-FUELS ASSN., *https://www.mnbiofuels.org/resources/production-in-minnesota* (last visited Nov. 14, 2019).

feed and fuel rather than it being sold just as a raw commodity."[14] Minnesota's ethanol industry has over 11,000 farmers who supply it with feedstock.[15]

27.     Minnesota is the third largest producer of DDGS in the U.S.[16] In 2011 alone, Minnesota produced 2.95 million metric tons of DDGS.[17] "Minnesota's ethanol industry has a 'multiplier effect' that benefits many economic sectors across the state, including agriculture, manufacturing, transportation, services, construction, and trade."[18]

28.     Heartland owns and operates a biorefinery facility in Winthrop, Minnesota. Heartland was founded in 1992 as a farmer-owned cooperative and is one of Minnesota's first ethanol producers.  As a farmer-owned cooperative of approximately 900 farmers, Heartland has steadily expanded over the years.  Heartland employs approximately 50 people.  Heartland produces ethanol, DDGS, and crude corn oil.  Heartland consumes approximately 37 million bushels of corn from Minnesota growers to produce in excess of 100MM gallons (250MM liters) of ethanol annually.  As described in more detail below, a co-product of ethanol production is distillers grains. Distillers grains come in many forms. One type of distillers grains is distillers dried grains with solubles or DDGS.  Heartland produces roughly 275,000 short tons of DDGS annually.

29.     To produce ethanol, Heartland acquires U.S. commodity corn from corn producers or other grain dealers.  The corn then goes through a milling process.  During this process, the

---

[14] *Minnesota Ethanol Industry: Ethanol Plants in Minnesota (2012)*, MINNESOTA DEPARTMENT OF AGRICULTURE, https://www.mda.state.mn.us/sites/default/files/2018-07/EthanolIndustryReport2012.pdf (last visited Nov. 14, 2019).

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

feedstock passes through a mill, which grinds it into a fine powder called flour.  Fermentation

begins when enzymes and water are added to convert starch into glucose, or simple sugars.  Yeast

is added to the mash to convert the sugars to ethanol and carbon dioxide.  The mash is continually

agitated and cooled until the ethanol concentration has been maximized.  The fermented mash

contains about 20 percent alcohol plus all the non-fermentable solids from the corn and yeast cells.

The mash is pumped to the continuous flow, multi-column distillation system where the ethanol is

removed from the solids and water.  The ethanol leaves the top of the final column at about 95

percent concentration; it is dehydrated to 200 proof, or 100 percent alcohol, and is then pumped to

a finished product tank.  Meanwhile, the residue mash, called stillage, is transferred from the base

of the column to the co-product processing area. The residue corn solids, which contain protein,

fat, fiber and other nutrients, are used by Heartland to produce distillers grains—including a

condensed and dried form of distillers grains known as DDGS—a nutritious animal feed. Other

like processes may be used to produce distillers grains. Every bushel of corn processed by an

ethanol plant can produce approximately 18 pounds of DDGS.

30.     Distillers grains and DDGS are commonly traded commodities with markets that

can be measured. Heartland has not exported U.S. corn, distillers grains, or DDGS to China.

Heartland sells its distillers grains and DDGS domestically on the open market. Nevertheless,

international markets have been a key destination for U.S. agricultural products for decades. At all

times relevant hereto, China has been a major export market for U.S. corn and DDGS.  Syngenta

knew this fact prior to commercializing Viptera based on knowledge garnered from its operations

in China, its own investigation of the issue, and its communications regarding same with other

industry participants, including members of the grain trade.  In fact, in a fourth quarter 2010

earnings conference call, Syngenta AG CEO Mike Mack stated that the "import requirements [of

China] alone influence global commodity prices."[19]

31.     Since at least 2008, China had been rapidly increasing its purchases of U.S. corn and corn products, including specifically DDGS, and was a key market for U.S. corn and DDGS. By 2010, China had emerged as a major market for U.S. DDGS,[20] a fact well-known to Syngenta at all times relevant herein.  In the 2011 – 2012 marketing year, 203 million bushels out of 1.543 billion total exported U.S. corn bushels were exported to China.  Also in 2011 – 2012, U.S. DDGS exports to China accounted for nearly 20 percent of all U.S. DDGS exports.[21]  According to the U.S. Grains Council, in 2012, China became the largest export destination for U.S. DDGS.[22]  In 2013, China accounted for more than 46 percent of U.S. export sales of DDGS.  By comparison, second-place Mexico imported less than half that amount during the same year.  In fact, in just the month of November 2013, China purchased more than 609,000 tons of U.S. DDGS.

32.     Given the size of the Chinese market, the laws of supply and demand drove the price of U.S. corn, distillers grains, and DDGS higher.

33.     Importantly, China has long been resistant to new genetically modified crops, and in fact requires new genetically modified seeds to be planted in China and generate crops for testing before a new genetically modified seed type is even eligible for import approval into China.

34.     Like the U.S., the European Union, and many other nations, China has adopted a

[19] See Transcript, *Syngenta AG, Q4 Earnings Conference Call*, SYNGENTA (Feb. 9, 2011), http://www.nasdaq.com/aspx/call-transcript.aspx?StoryID=251790&Title=syngenta-ceo-discusses-q4-2010-results-earnings-call-transcript.

[20] USDA FOREIGN AG. SERV. INT'L AG. TRADE REPORT: DISTILLERS DRIED GRAIN EXPORTS SURGE ON CHINESE DEMAND, Jun. 3, 2010, https://grist.files.wordpress.com/2010/07/ddg_iatreport_june_10.pdf (last visited Jun. 7, 2016).

[21] USDA ECON. RES. SERV. A MARKET FOR U.S. DISTILLERS DRIED GRAINS EMERGES IN CHINA (Dec. 3, 2012), https://www.ers.usda.gov/amber-waves/2012/december/a-market-for-us-distillers-dried-grains-emerges-in-china/ (last visited Dec. 8, 2016).

[22] U.S. GRAINS COUNCIL: MARKET DATA – TOP U.S. EXPORT PARTNERS, https://www.grains.org/market-data/top-us-export-partners (last visited Jun. 8, 2017).

"zero tolerance" policy with respect to the importation of unapproved genetic traits, a fact well known to Syngenta at all times relevant hereto.

35.     Due to the interdependence and connectedness of the modern U.S. agricultural industry, there is a shared responsibility among industry participants to exercise reasonable care in the commercialization, handling, marketing, selling, and shipping of new biotechnology products to protect other known industry stakeholders, including producers and non-producers, from an unreasonable risk of harm. Syngenta recognizes the interconnectedness of the industry and market by referring to Heartland and other biorefineries as "stakeholders" in its commercial activities and by its representations that it would take certain steps to protect Heartland and other industry stakeholders from the very harm that occurred. Moreover, Syngenta has represented publically that corporate responsibility is part of everything it does, from developing its products to controlling the impact of its operations, and that it has a corporate responsibility to industry stakeholders to properly steward its biotechnology products.[23]

***Syngenta's Genetically Modified Corn***

36.     As important background to this entire catastrophe, in March 2007, Syngenta announced plans to commercialize MIR 604 (Agrisure RW)—another genetically modified trait of corn—prior to many export markets granting approval of this trait. Subsequently, grain exporters and handlers refused to accept the corn that contained this trait, and trade organizations warned Syngenta that it was exposing the grain industry to severe financial risks. Syngenta avoided disaster when Japan approved the trait at the eleventh hour in August 2007. Therefore, to diffuse

---

[23] *Corporate Responsibility*, SYNGENTA, http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/Pages/corporate- responsibility.aspx (last visited Jun. 8, 2017) and *Stewardship*, SYNGENTA, http://www.syngenta.com/global/corporate/en/about-syngenta/corporate-responsibility/operations/stewardship/Pages/stewardship.aspx (last visited Jun. 8, 2017) ("Taking responsibility for our products – from the production of seeds to the safe use, storage and disposal of crop protection products by growers – is a priority at Syngenta . . . .").

and preemptively address a situation in which approval was lacking, the Biotechnology Industry Organization released a Product Launch Stewardship Policy ("BIO Product Launch Policy"), which set forth industry guidelines for companies to adhere to prior to the commercialization of a new GM seed. Specifically, the BIO Product Launch policy sets forth three (3) things to be accomplished prior to commercialization: (1) conduct a market and trade assessment to identify key import markets, including those with functioning regulatory systems [i.e. market intelligence], (2) consult at an early stage with the value chain for the specific crop [i.e. marketing], and (3) meet applicable regulatory standards in key markets…unless determined otherwise in consultation with the value chain of the crop [i.e. trade policy/market access]. In relevant part, the BIO guidelines state: "BIO's Food and Agriculture Section believes that individual companies, prior to commercialization of a new biotechnology-derived plant product in a Commodity Crop intended for food and feed, *should meet applicable regulatory requirements* in key countries identified in the trade assessment that have functioning regulatory systems and are likely to import commodities including the new biotechnology-derived plant products."

37.     Syngenta announced support for the BIO Product Launch Policy,[24] and adopted its own launch policy in 2007, which incorporated the BIO Product Launch Policy's provisions. Through these policies, Syngenta pledged to engage in good stewardship policies, seek and respond to feedback from its stakeholders, and not to commercialize new genetically modified products that had not been approved in key markets. Additionally, Syngenta pledged to abide by the stewardship standards set by CropLife International and Excellence Through Stewardship, which advocate for the commercialization of biotech enhanced traits **only *after*** receiving broad

---

[24] Though BIO policies are minimum standards of responsible behavior for companies, companies have the ability to implement additional measures designed to "facilitate adoption and use of [commodity crop] products and to prevent the disruption of . . . the trading of the commodity." *See Excellence Through Stewardship*, SYNGENTA, http://c.ymcdn.com/sites/www.excellencethroughstewardship.org/resource/ (last visited Feb. 26, 2016).

acceptance in key U.S. export markets.25

38.      Syngenta's Viptera and Duracade brands of corn seed each have a genetically modified protein that purportedly makes the corn plant more resistant to insects and other pests. As bio-engineered products, Syngenta's genetically modified corn was subject to regulatory approval prior to commercialization.

39.      Other countries take varying periods of time to review and approve or disapprove new genetically modified grains before they can be imported into that country. China's regulatory process begins *after* regulatory approval of the seed in the exporting country, and typically takes at least two years for a regulatory decision to be made.

40.      At all times relevant hereto, Syngenta was familiar with China's regulatory process for obtaining import approval for new biotechnology products. In or about March of 2010, Syngenta applied to have Viptera deregulated in China such that it would be eligible for import from the U.S. Syngenta knew that after submission of its application, the review process would last some two or three years, and could take longer depending on the circumstances, including if insufficient information was provided in the application.26 Syngenta also knew or should have known that its request to deregulate Viptera for cultivation in China would lengthen the overall review and deregulation process.

41.      Viptera is a brand of yellow corn that has been genetically altered to contain the "Vip3A" insecticidal protein that is supposed to help corn crops resist various corn pests.

---

25 Syngenta quietly resigned as a member of BIO, effective January 2011, due to concerns over the effectiveness of BIO in advocating commercialization policies on Syngenta's behalf.  However, Syngenta maintained that its commitment to the standards set by CropLife International and Excellence Through Stewardship were unaffected by its withdrawal from BIO. *See Id.*

26 Heartland alleges that because Syngenta failed to provide all information, studies, and paperwork required by Chinese authorities to process its application, the application review process was unnecessarily delayed.  Syngenta's application was rejected at least four times by Chinese authorities because it was inadequate, inaccurate, or incomplete.

42.     On or about August 31, 2007, Syngenta petitioned the USDA to deregulate Viptera (MIR 162). In or about April of 2010, Viptera was deregulated by the USDA. Also in 2010, the United States Environmental Protection Agency ("EPA") granted registration approval for genetic trait stacks including Syngenta's Agrisure Viptera gene.

43.     Numerous other countries, however, refused to approve Viptera corn as fit for human consumption. These countries included China, Venezuela, South Korea, Saudi Arabia, Cuba, and Jamaica. These nations collectively comprised over 25 percent of the U.S. corn export market.

44.     Nevertheless, promptly after receiving approval for Viptera in the U.S., Syngenta began marketing, distributing, and selling its Viptera corn seeds—even though it had not received approval from other countries that purchase U.S. corn and DDGS and on whose purchases the market price for U.S. corn and DDGS depends. Knowing under the circumstances that contamination of the U.S. corn and DDGS supply with Viptera would result, Syngenta risked Heartland's livelihood on the approval of Viptera by the major corn importing countries.

45.     Syngenta was not concerned about the livelihood of industry stakeholders, including Heartland. Rather, Syngenta's sole interest was in maximizing the profits it could reap from Viptera during the period of its patent. In fact, Syngenta projected that Viptera corn seed would ultimately exceed 20 percent of the corn seed market.

46.     Syngenta's Duracade brand corn seed also expresses a new Bt Cry protein, eCry3.1Ab, that was genetically designed for the alleged purpose of helping to control problems with corn rootworm. This new protein had never been used commercially before Syngenta's introduction of Duracade. On or about April 22, 2011, Syngenta petitioned the USDA to deregulate Duracade (Event 5307). The EPA granted registration approval of Syngenta's Duracade trait in October 2012. In or about February of 2013, Duracade was deregulated by the USDA. Once again,

18

without having obtained approval for Duracade in major U.S. export markets, including China and European Union, Syngenta began marketing, distributing, and selling Duracade in the United States in 2014.

47.    Notably, Syngenta AG announced that it would not sell Duracade brand corn seed in Canada for planting and that any seed containing Duracade shipped to Canada "cannot be sold" and that "arrangements for immediate returns will be made."[27] Syngenta's announcement noted the lack of regulatory import approvals in other countries, particularly China and the European Union. "Accordingly, we want to ensure the acceptance of any trait technology grown in Canada meets end market destination requirements."[28] The actions of Syngenta in Canada stand in stark contrast to the conduct of Syngenta in Minnesota and the United States.

48.    The U.S. market for distillers grains is tied to global sourcing and achieving a sustainable supply is dependent on fungibility — the principle that the supply of a given crop has a degree of substitutability and comparable value regardless of where it is produced. Distillers grains that can be commingled without concern over regulatory status can be efficiently moved in a cost-effective manner in response to buyer demands. Syngenta's decision to commercialize its Viptera and Duracade corn seeds has directly affected the position of the United States as a competitive supplier of DDGS.

***Syngenta's Genetically Modified Corn Contaminates the U.S. Corn and DDGS Supply***

49.    In marketing and selling Viptera in the United States, Syngenta knew that it was not possible to completely isolate Viptera from other types of corn absent the implementation by it of strict stewardship, containment, and channeling measures.  Corn replicates by cross-

---

[27] Tom Polansek, *UPDATE 1-Syngenta Halts Sales of New GMO Corn Seed in Canada*, REUTERS (Mar. 11, 2014, 3:40 AM), http://in.reuters.com/article/syngenta-corn-canada-idINL2N0M71UX20140310.

[28] *Id.*

pollination from one plant to another. Pollen from corn stalks "drift" over considerable distances and cross-breeds with other corn plants. At all times relevant hereto, Syngenta knew that Viptera corn would cross-pollinate with other nearby corn plants resulting in contamination of those plants with Viptera.

50.    Additionally, Syngenta knew that the U.S. corn marketing system is commodity-based. This means that corn is harvested, gathered, and shipped from hundreds of thousands of farms through local, regional, and terminal grain elevators.

51.    Therefore, given the permissive and market-driven nature of the U.S. grain handling system, Syngenta knew that unless strict stewardship and identity preservation measures were implemented at all levels – from the farm level through the marketing chain – Viptera would contaminate other U.S. corn crops, infiltrate the domestic U.S. corn and DDGS supply, and cause the closure of foreign markets that imported U.S. corn and DDGS but had not approved Viptera.

52.    Syngenta's knowledge of this fact is indisputable. In fact, in its deregulation petition, Syngenta represented to the USDA that it would implement a "product stewardship program" which would be "monitored and enforced [by Syngenta] according to a fully documented compliance program" to "divert this product away from export markets (i.e. channeling) where the grain has not yet received regulatory approval for import."[29] Syngenta also represented that its MIR 162 trait should have "no effects on the U.S. maize export market[.]"[30] By these and other similar representations to the USDA and industry stakeholders, Syngenta recognized that the implementation, oversight, and execution of a vigorous stewardship program was the industry standard and essential to segregate Viptera from other corn to channel Viptera into accepting

[29] See Dennis P. Ward, Ph.D. and Scott A. Huber, *Petition for Determination of Nonregulated Status for Insect-Resistant MIR162 Maize*, SYNGENTA (Aug. 31, 2007), https://www.aphis.usda.gov/brs/aphisdocs/07_25301p.pdf.

[30] *Id.*

20

markets and avoid contamination.  At all times relevant hereto, Syngenta also knew that the industry standard was to obtain import approval in key foreign markets, including China, prior to its commercialization of Viptera in the U.S.

53.    Despite the foregoing, and despite Syngenta's representations to the USDA and industry stakeholders that it was committed to principles of good stewardship to protect industry stakeholders from the loss of the Chinese and other export markets due to the commercialization of its Viptera corn seed, Syngenta failed to employ any meaningful or adequate stewardship, segregation, and identity preservation measures to isolate Viptera from other commercial U.S. corn. Moreover, Syngenta failed to adequately inform and educate Viptera farmers and other industry stakeholders on the proper handling, stewardship, segregation, and channeling of Viptera to prevent contamination of the domestic corn supply. Syngenta failed to implement or failed to adequately implement a compliance program with Viptera growers to contain and channel Viptera to accepting markets. Before commercializing its seed, Syngenta could have required Viptera growers to agree to identity preserve and use all of the corn produced for on-farm use only, such as silage.  Syngenta also could have required Viptera growers to agree to identity preserve and channel the corn produced for intrastate consumption.  Yet, it took no such precautions or any other precautions to prevent Viptera from contaminating the U.S. commercial corn and DDGS supply.

54.    Rather, Syngenta engaged in several acts of affirmative wrongdoing which not only increased the risk of contamination of the U.S. commercial corn and DDGS supply, but made it a virtual inevitability.  For instance, Syngenta misrepresented and deceived industry stakeholders concerning the standing of its petition for deregulation of Viptera/MIR 162 with the Chinese government.  Syngenta indicated that approval of its Viptera corn seeds would happen quickly,

21

when in fact this was not true.[31] Syngenta directed many producers to plant Viptera corn in 2011 and 2012, assuring them and industry stakeholders that China would issue import approval for the MIR162 trait by spring of 2012. Syngenta misrepresented to industry stakeholders China's significance as a purchaser of U.S. corn and corn products. Further, despite knowing that China was increasing yearly the volume of its purchases of U.S. corn and corn by-products, Syngenta also continued to increase its sales of Viptera corn seed in 2012 and 2013 further heightening the likelihood of contamination. Additionally, to demonstrate the many attributes of its Viptera corn seed, Syngenta instructed farmers to raise Viptera directly alongside other commercial corn, resulting in cross-pollination and commingling of Viptera with other commodity corn. Likewise, Syngenta encouraged Viptera growers to deliver Viptera grain to any and all nearby grain elevators, handlers, and distributors. Furthermore, at various times, Syngenta represented to U.S. corn farmers and other industry stakeholders that Viptera could be sold to, and imported by, Chinese buyers, when in fact it could not. Syngenta engaged in all of the above-referenced conduct and wrongdoing simply to increase its revenue from the sale of its Viptera product, knowing fully the harm that would result to other industry stakeholders, including Heartland, upon the contamination of the U.S. domestic corn and DDGS supply and the loss of major export markets, including China.

55.     Syngenta knew that the timing, manner and scope of how it commercialized Viptera would contaminate the U.S. corn and DDGS supply with the traits found in Viptera. That was Syngenta's design. The contamination that occurred was actually foreseen by Syngenta, and industry stakeholders, including Heartland, suffered the very harm that Syngenta expected would

---

[31] *See, e.g.,* Transcript of Investor Presentation, *First Quarter 2012 Sales,* SYNGENTA (Apr. 18, 2012), http://www.syngenta.com/global/corporate/SiteCollectionDocuments/pdf/transcripts/q1-2012-transcript-syngenta.pdf ("On the import approval [for Viptera], it has import approval in all of the major markets. There is an outstanding approval for China, which we expect to have quite frankly within the matter of a couple of days.").

occur in reckless disregard to the rights of Heartland.

56.     At all relevant times, the risk of harm to industry stakeholders, including Heartland, posed by the negligent and premature commercialization of unapproved transgenic events was well-known to Syngenta. The presence of unapproved genetically modified traits in U.S. commodity exports has a history of generating import bans, which have repeatedly caused trade disruptions and devastating financial losses for members of the U.S agricultural industry. For example, it was well known to Syngenta in September of 2000, that traces of an unapproved transgenic corn variety called "StarLink" were detected in U.S. corn products.[32] Immediately following the discovery, Japan and South Korea, the first and second largest importers of U.S. corn at that time, virtually halted all U.S. corn imports. The price of U.S. corn dropped dramatically. The U.S. commodity market took another hit in 2006, when unapproved genetically modified rice was detected in the U.S. rice supply. That led several U.S. trading partners, including the European Union, to ban or significantly reduce acceptance of U.S. rice exports, causing the U.S. rice industry hundreds of millions of dollars in losses.[33] Syngenta had full knowledge of these and other trade disruptions at all times relevant hereto.

57.     Further, at all relevant times Syngenta was fully aware of the significant costs ethanol plants and biorefineries, including Heartland, would incur as a result of its tortious conduct including, without limitation, market losses, commercial costs, revenue costs, loss of goodwill, and lost sales of distillers grains. As a result of Syngenta's conduct described herein, numerous ethanol plants have been forced to shut down their operations completely for various lengths of time or to dump distillers' grains that could not be marketed, resulting in loss of business and loss

---

[32] *In re: StarLink Corn Products Liability Litigation,* MDL No. 1403 (N.D. Ill.).
[33] *In re: Genetically Modified Rice Litigation,* MDL No. 1811 (E.D. Mo.).

of revenues.

58.     The contamination of U.S. crops by transgenic traits that are not approved for import by major foreign markets have consistently and predictably resulted in lost export markets and depressed crop prices. By commercializing Viptera and Duracade in the manner stated herein without receiving import approval from China, one of the U.S.'s largest trading partners for corn and DDGS, Syngenta unreasonably disregarded a foreseeable risk of harm to Heartland.

59.     Syngenta holds the ultimate control over when and where its seed is marketed by determining whether to make it commercially available. Syngenta is also able to exercise control and mitigate contamination of U.S. crops through technology licenses that restrict the marketing of its seed, including geographically or otherwise.  Instead, Syngenta put large volumes of trade worth billions of dollars at risk by introducing genetically modified traits that would inevitably contaminate traded commodity lots and result in a measurable presence of its unapproved biotech events in international shipments, including those bound for China.

### The Harm Caused by Syngenta to Heartland

60.     In November 2013, China began rejecting shipments of U.S. corn after inspection tests revealed the presence of Syngenta's unapproved Viptera corn. In November and December 2013 alone, China rejected more than 665,000 metric tons of U.S. corn shipments due to the presence of Viptera. The Chinese General Administration of Quality Supervision, Inspection, and Quarantine ("AQSIQ") began inspecting "every single shipment" of U.S. corn to detect Viptera. If Viptera was detected, China rejected the shipment because of its "zero-tolerance" policy for unapproved imports, which both China and the United States have adopted.

61.     In late December 2013, Chinese officials stated that shipments of DDGS from the U.S. were contaminated with Viptera. The AQSIQ announced that it was inspecting "every single shipment" of U.S. DDGS to detect Viptera.  If Viptera was detected, China rejected the shipment

because of its "zero-tolerance" policy for unapproved imports, which both China and the U.S. have adopted. In June of 2014, after testing by Chinese authorities over the course of several months revealed that numerous shipments of U.S. DDGS were contaminated with Viptera, China unofficially stopped issuing new U.S. import permits for DDGS. Then, in late July of 2014, AQSIQ announced that all U.S. DDGS shipments must be officially certified by the U.S. government as free of MIR162 before leaving U.S. ports. This effectively banned the import of all U.S. DDGS into China. U.S. shipments of DDGS to China dried up and prices of U.S. distillers grains plummeted. To date, China has canceled or rejected millions of tons of U.S. DDGS due to the presence of MIR162.

62.     Before China's rejection of U.S. DDGS began, the USDA forecast that China would triple its import of DDGS to seven million tons. Indeed, China had rapidly increased its import of U.S. DDGS since 2008, and particularly in the last two years prior to the rejections, and was by far the largest market for U.S. DDGS exports (roughly 50 percent of all exports). Yet, Syngenta's contamination of the U.S. commercial corn supply with Viptera has caused the loss of the Chinese market to U.S. DDGS. The sale of U.S. distillers grains, including DDGS, constitutes a significant portion of revenue for ethanol plants and biorefineries, including Heartland. The loss of this large export market has resulted in substantially reduced prices for all U.S. DDGS and has cost the U.S. agricultural industry billions of dollars in losses.

63.     In 2014, despite having full knowledge of the market disruption resulting from its negligent commercialization of Viptera, Syngenta began marketing yet another genetically modified corn seed known as Duracade. In addition to MIR 162, Duracade also contains another genetically modified trait known as Event 5307. Neither MIR 162 nor Event 5307 were approved in China at the time Syngenta commercialized its Duracade seed. In fact, at the time Syngenta commercialized its Duracade seed, none of the following countries had approved Duracade for

25

human or animal consumption: China, the 28 states of the European Union, Brazil, Switzerland, Colombia, Egypt, India, the Philippines, the Russian Federation, Indonesia, Thailand, Singapore, Kazakhstan, Belarus, and Turkey. Even to this day, Duracade remains unapproved in many countries. Yet, Syngenta keeps selling this seed in total disregard of the consequences. By negligently and prematurely commercializing its Duracade corn seed, Syngenta knowingly and intentionally intensified and extended the disruption to, and loss of, the Chinese market and other key foreign markets to U.S. corn and corn products, including DDGS.

64.    Although Syngenta did eventually gain approval for the import of Viptera to China in December of 2014 and for the import of Duracade to China in July of 2017, this approval came far too late to prevent the loss of the Chinese market to U.S. DDGS. The loss of the Chinese market to U.S. DDGS has caused diminished prices for distillers grains in the United States and damages to Heartland.

65.    As both foreseen and intended, Syngenta's genetically modified corn contaminated the U.S. corn supply, and consequently, U.S. distillers grains produced therefrom. China, the fastest growing export market for U.S. DDGS, discovered the contamination and banned the import of all U.S. DDGS in the summer of 2014. As a result, exports of U.S. DDGS have been reduced dramatically. Given the laws of supply and demand, prices of U.S. distillers grains (including DDGS) have fallen as well.

66.    Heartland has sustained significant damages as a direct and proximate result of Syngenta's tortious conduct. Syngenta's commercialization of Viptera and Duracade and its continued sales of Viptera and Duracade corn seed in increasing amounts in subsequent years caused widespread physical contamination of Heartland's land and facilities, corn, distillers grains (including DDGS), equipment, storage containers, transportation facilities and machinery. Heartland's damages include, but are not limited to, diminished prices for its distillers grains

26

resulting from the loss of the Chinese export market, commercial costs, lost business opportunity, lost profits, lost sales of distillers grains, physical destruction of Heartland's property, loss of goodwill, and "other losses" associated with Syngenta's contamination. Heartland has been harmed by Syngenta's decision to prematurely commercialize, market, and distribute its genetically modified corn seed not approved in major U.S. export markets. The loss of a large purchaser of U.S. DDGS like China as a result of Syngenta's Viptera and Duracade contamination has had a calamitous impact on the market for U.S. distillers grains, including DDGS. This suit seeks to recover the damages that Syngenta's conduct directly and proximately caused Heartland.

## CLAIMS FOR RELIEF

## COUNT 1: NEGLIGENCE AND/OR GROSS NEGLIGENCE

67.      Heartland realleges the above paragraphs as though fully set forth herein.

68.      Syngenta's acts and/or omissions, as described herein, constitute negligence and/or gross negligence.

69.      Under the circumstances set forth herein, Syngenta had a duty to refrain from commercializing Viptera and Duracade in a manner that would foreseeably cause harm to Heartland, to use ordinary care in its commercialization of Viptera and Duracade, and to protect Heartland from an unreasonable risk of harm. Syngenta owed Heartland a duty of reasonable care concerning the timing, manner, and scope of its commercialization of Viptera and Duracade.

70.      Syngenta breached these duties by failing to exercise reasonable care to prevent the foreseeable contamination of the U.S. corn supply that would naturally result from the premature commercialization and distribution of Viptera and Duracade under the circumstances set forth herein. Syngenta failed to provide adequate channeling and stewardship programs which would have avoided contamination via cross-pollination and commingling. As set forth thoroughly throughout this Complaint, Syngenta also engaged in several acts of affirmative wrongdoing which

27

not only increased the risk of contamination of the U.S. commercial corn and DDGS supply and the closure of the Chinese market to U.S. DDGS, but made it inevitable.

71.     Syngenta's breaches of duty are a direct and a proximate cause of the damages suffered by Heartland.

72.     The rejection by China of U.S. DDGS could not have occurred without Syngenta's negligence in prematurely releasing its genetically modified corn seed without prior approval of major export partners because the commercialization of these genetically modified corn seeds was solely under its management and control. Syngenta made the decision to commercialize Viptera and Duracade knowing and intending that it would contaminate the U.S. corn and DDGS supply. Viptera and Duracade in fact contaminated the U.S. corn and DDGS supply, which could not have occurred without Syngenta's negligence. Syngenta had exclusive control over the commercialization of Viptera and Duracade and these unapproved genetically modified traits could not have contaminated the U.S. corn and DDGS supply without a lack of proper care.

73.     Syngenta's conduct described herein was grossly negligent; indeed, it was malicious, or so willful and wanton as to demonstrate a reckless disregard for the rights of Heartland.

74.     At all relevant times, Syngenta had conscious, actual knowledge of a situation requiring the exercise of reasonable care and diligence to avoid injury to Heartland. Syngenta ignored outcry and pleas from the industry to wait for import approval from China and intentionally introduced Viptera and Duracade into the U.S. corn supply. Further, despite representing to industry stakeholders that it had the ability to prevent, and in fact *would* prevent, the resulting harm to the U.S. corn and distillers grains market by providing channeling and stewardship programs to prevent contamination and commingling, Syngenta failed to do so.

75.     Syngenta engaged in reckless and malicious conduct demonstrating a singular

disregard for substantial risk of harm to Heartland. At all relevant times, Syngenta knew that the act of commercializing new genetically modified traits requires the exercise of reasonable care and diligence to avert injury to others, such as Heartland. Syngenta placed its own financial interest over the interests of Heartland and other industry stakeholders and set in motion events that directly resulted in massive and catastrophic losses to Heartland's property and economic interests.

76.     Syngenta's negligence was a direct and proximate cause of Heartland's injuries and damages. Heartland's injuries and damages would not have occurred absent Syngenta's negligence. Heartland suffered injury and physical damage to its property by the sale and distribution of Viptera and Duracade by Syngenta as outlined herein. Heartland seeks compensatory damages, together with all reasonable attorney fees, interests and costs allowed by law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, HEARTLAND CORN PRODUCTS, requests that this Court enter judgment jointly and severally against Defendants, Syngenta Seeds, LLC, Syngenta Corporation, Syngenta Crop Protection, LLC, and Syngenta Biotechnology, Inc. for damages in an amount in excess of $50,000.00 to be determined by the trier of fact, for Heartland's costs, pre-judgment and post-judgment interest, attorneys fees, and all other just and proper relief.

## JURY DEMAND

Heartland demands a Jury Trial.

29

Dated:  November 15, 2019

Respectfully submitted,

*/s/ Michael K. Johnson*
Michael K. Johnson (0258696)
Timothy J. Becker (0256663)
**JOHNSON BECKER, PLLC**
444 Cedar St., Suite 1800
St. Paul, Minnesota 55101
Telephone: (612) 436-1800
Facsimile: (612) 436-1801
mjohnson@johnsonbecker.com
tbecker@johnsonbecker.com

Martin J. Phipps (TX Bar No. 00791444)
*Pending Admission Pro Hac Vice*
Barry Deacon (TX Bar No. 24096725)
*Pending Admission Pro Hac Vice*
**PHIPPS ANDERSON DEACON LLP**
102 9th Street
San Antonio, Texas 78215
Telephone: (210) 340-9877
Facsimile: (210) 340-9899
mphipps@phippsandersondeacon.com
bdeacon@phippsandersondeacon.com

**ATTORNEYS FOR PLAINTIFF,
HEARTLAND CORN PRODUCTS**

**Minn. Stat. § 549.211**

**ACKNOWLEGEMENT**

The party or parties on whose behalf the attached document is served acknowledge through their undersigned counsel that sanctions may be imposed pursuant to Minn. Stat. § 549.211.

Dated: November 15, 2019

Respectfully submitted,

*/s/ Michael K. Johnson*
Michael K. Johnson (0258696)
Timothy J. Becker (0256663)
**JOHNSON BECKER, PLLC**
444 Cedar St., Suite 1800
St. Paul, Minnesota 55101
Telephone: (612) 436-1800
Facsimile: (612) 436-1801
mjohnson@johnsonbecker.com
tbecker@johnsonbecker.com